## OCTOBER TERM, 1856.

ASHER B. BATES, Special Law Adviser of the Crown, *vs.* H. PRENDERGAST, *et als*, constituting the Hawaiian Steam Navigation Company.

The court decreed a forfeiture of the exclusive privileges granted by the Government to the Hawaiian Steam Navigation Co., on the ground that the latter had failed to furnish the requisite steam facilities for the inter-Island trade, according to their contract.

PER CURIAM :

This is a petition for a decree of the forfeiture of the rights and privileges, granted by the Hawaiian Government to Garet W. Ryckman and others, associated under the name and style of the Hawaiian Steam Navigation Company. On the 27th of December, 1853, the Hawaiian Government entered into a contract with Garet W. Ryck-

man and others, whereby it granted them the exclusive privilege of steam navigation between the several ports and islands of the kingdom for the term of ten years; and the same exclusive privilege for the tugging and towing of vessels by steam in and out of the harbor of Honolulu, together with certain other rights and privileges in said contract mentioned; on condition that the said Ryckman and others, forming the Hawaiian Steam Navigation Company should "have employed in said inter-island navigation, a new and substantial steamer, of not less than 350 tons burthen, within twelve months from this date, in addition to the steamer "Akamai," now employed; and which the said Company shall keep employed for said purposes contemplated in this grant, or one equally commodious and safe;" and also on the further condition that said Company should "furnish all the steam facilities which the business of the Hawaiian Islands requires, not only for the inter-island communication, but for the tugging and towing in and out of the harbor of Honolulu." This contract was in part modified by a Resolution of the Legislature, on the 10th August, 1854, by which the time for employing a new and substantial steamer, of not less than 350 tons burthen, in addition to the "Akamai," was extended to the 19th of December, 1855.

The first inquiry in this matter is, Has the contract been complied with on the part of the Hawaiian Steam Navigation Company ? On behalf of the Crown it is alleged that it has not been. This is, in effect, admitted by the defendants, who say that there has not been a complete and literal fulfillment of the contract, but that there has been a partial fulfillment, which partial fulfillment has been quietly acquiesced in, and impliedly accepted, by the Hawaiian Government as a complete fulfillment.

The main facts of the case are in substance as follows : On the 16th of October, 1854, the Company's steamer "Sea Bird," a good and substantial vessel of 440 tons, arrived at Honolulu and was employed in the inter-island navigation. But after making four or five trips to the windward islands, she is withdrawn, on the ground of her being too expensive, and after lying a few months in the harbor of Honolulu, was finally, on the 16th April, 1855, sent back to California, where it is admitted she is now engaged in the coasting trade.

On the 23d of October, 1854, the Company's steamer "West Point," of 239 tons, arrived, and engaged in the business of the inter-island navigation; but owing to the weakness of her hull and the defective state of her boiler, she was not kept running more than half of the time, between her arrival and the date at which she was laid up to await the arrival of her new boiler. Mr. Johnson, who helped to repair her in San Francisco in 1850 or 1851, testifies that she was not considered a substantial vessel; that in his opinion she was then four or five years old; and that it was matter of general wonder how she ever doubled Cape Horn. He subsequently caulked her, soon after her arrival at Honolulu, and although the work was well done, he observed after a single trip she had the oakum hanging out of her seams, showing that she would not stand caulking. This was owing to the great working of the vessel from the weakness of her hull. Afterwards, in 1855, he was called upon to examine the "West Point," and states that he then found her very deficient in strength; the butts of the ceiling inside were two inches apart, when they ought

to have been close together, and her main beams had been improperly braced with straight braces, which were fastened with cut nails or other insufficient fastenings.   He condemned the whole affair, and did not consider the "West Point" a seaworthy vessel.   Mr. Dougherty, a witness for the defendants, testifies that in August, 1855, he repaired her, and found that she was weak throughout, never having been braced.   She was particularly weak at one place forward where new gangways had been cut, on account of an alteration made in her cabin.   Said he never saw a vessel like the "West Point" come out of a ship-yard for an ocean steamer—she was not stiff enough without braces.   Mr. Harris, who made several passages in her, states that she was not a safe vessel to make a passage to the windward. He says in his opinion she was unsafe for man or beast, and ought to have been condemned; that during one trip he made in her to Maui, she worked up and down several inches, and that she was nearly twenty-four hours in making the passage to Lahaina, a distance of only about 80 miles.   Mr. Spalding, who made several passages in her, says, that in returning from Kauai, on one occasion, they found the flues of her boiler very defective, and on reaching mid-channel she gave out, and they put back for Kauai.   He did not consider her at that time safe to cross a mill-pond.   After repairing two planks, the butts of which had sprung, on either side of the vessel; landing the bulk of her freight, and leaving some of her passengers who were afraid to risk their lives in the boat, they started again for Honolulu, but found the boiler would not make steam enough to carry her through, and the second time put back for Kauai; on the third trial, they took with them a whale boat furnished with water and provisions, to be used in case of necessity, and succeeded in reaching Honolulu; the boat however worked up and down six or eight inches.   Mr. Weston, who examined the boiler of the "West Point" soon after she arrived from California, testifies that it was neither new nor substantial, but on the contrary, rusty and defective.   He thinks the boat must have been entirely unseaworthy previous to her repairs in August, 1855, on account of the leaky and defective state of her boiler. He furthermore states that from the time of her coming here until her loss, he thinks she was laid up full half the time, on account of her bad boiler and frequent need of repairs.

On the part of the defence, no witness has been produced who considered the "West Point" a staunch, substantial, or seaworthy vessel, until after her repairs in August, 1855, and it is not claimed by defendants' counsel that she was so.   Whether she was seaworthy or not, after those repairs, will be apparent from the fact that she made but two or three trips afterwards, before being finally laid up to await the arrival of her new boiler.   The first trip subsequent to her being repaired, she was twenty-four hours in reaching Lahaina, going around Lanai because she did not dare to venture through the channel, and, in the opinion of Mr. Harris, was unsafe for man or beast.

Can it be contended under this evidence that the "West Point" was such a boat as to fulfill the terms of the contract ?   Was she a new and substantial steamer, safe, seaworthy, and suitable for our inter-island navigation?   We think not; but, on the contrary, that she was old, unsubstantial, unsafe, and unseaworthy, and did not furnish the "steam facilities which the business of the Hawaiian Islands

requires." Moreover, she did not meet the requirements of the contract in her tonnage, being a vessel of only 239 tons, while the 6th article of the contract calls for " a new and substantial steamer, of not less than 350 tons burthen."

In our opinion, the only safe and suitable vessel ever furnished by the Company for the inter-island trade was the steamer " Sea Bird," and her withdrawal by them without having supplied her place by another vessel equally suitable, was an abandonment, and worked a forfeiture of their rights and privileges under the contract. That she was found too expensive for the business, affords no justification for her withdrawal.

Since the loss of the " West Point," at Koloa, on the 5th of January last, the Company have had no vessel whatever employed in the inter-island trade, and they give as an excuse that no suitable vessel can be procured this side of Europe, or the Atlantic States, and that engines, for a new vessel to be built in California, have been ordered by them in New York. But it is admitted that the " Sea Bird" is still running on the coast of California; then why was she not returned here to take the place of the " West Point?" Had she been so returned, she would have had the entire business to herself, and might under those circumstances have been profitable. But, as we have said before, the question of her being profitable or not does not affect the merits of the matter under consideration. The Company had made and undertaken to fulfill a contract, and if they found it unprofitable, and on that account wished to be released from their liability to fulfill it, they ought to have applied to the other party for such release. Again, there is much force in the argument of the counsel for complainant, that the Company ought to have kept an extra steamer on hand to provide for accidents and emergencies, for they were bound not only to furnish, but to keep employed, such suitable steamers as the business of the islands might require. It is well settled, that when a party promises to do a thing which becomes impossible by contingencies which should have been foreseen and provided against, that such impossibility is no defence to an action for a breach of the contract.

But it is said by the learned counsel for the defendants, that the government has permitted the Company to go on, from time to time, in the partial fulfillment of their contract, without remonstrance or complaint; that, if the Company have not performed their part of the contract, such non-performance has been known to the King, the Minister of the Interior and the Legislature, who have found no fault, nor given any notice to the Company of an intention to rescind the contract, and that it is unconscionable and unjust, at this late day, after seeing and acquiescing in the partial performance of the contract, to ask for its rescission on the ground of non-performance. This partial performance, says the learned counsel, ought to be considered equivalent to a full and complete performance, and the Company permitted to retain all the exclusive rights and privileges granted to them by the government.

This ground of defence is as novel as it is unsound. It is true that the government has forborne to complain, though in justice they might often have done so. It is true the government has exercised great forbearance in permitting this Company from time to time to run un-

safe, unsuitable and unseaworthy boats. It is true it has shown great indulgence to them in not complaining until this late day, though for a large portion of the time they have entirely failed to keep up the inter-island communication. But can this great forbearance and indulgence on the part of the government, be fairly set up as an act or omission which releases the Company from their obligation to perform their part of the contract ? We think not; and in our opinion, such a defence is just as unreasonable as would be that of the maker of a promissory note, who should urge as a defence against an action brought to enforce the payment of the note, that the payee had permitted the note to mature—received interest and small payments on the same, and granted him indulgence upon indulgence until it was unconscionable and unjust to sue him for the balance.

This brings us to the question whether the Company have furnished all the "steam facilities which the business of the Hawaiian Islands requires," "for the tugging and towing," of vessels, "in and out of the harbor of Honolulu."

It appears by the evidence that, until within the present year, the Company has had no regular tug-boat employed in the tugging service of Honolulu; and that at times all of their steamers have been absent, so that if a vessel had required a steam-tug, it could not have procured one. But to this it is answered that the pilots of Honolulu would not take a steam-tug and that therefore it was useless to keep one ready for the service. This answer is not a good one, for by the express terms of the contract, the government conferred all the privileges of a pilot upon any steam-tug the Company might see fit to employ, and they were wholly independent of the other pilots of Honolulu. If the Company have failed to man and equip their vessel in a manner to enable them to discharge the obligations and duties of a pilot, it is their own fault.

It is further contended on the part of the Crown, that the "Akamai," the vessel which the Company have recently employed in the business of tugging, is not equal to the work; that she has endangered the safety of several vessels through her want of power; and that she does not furnish all the steam facilities which the business of the Islands require, for tugging, at Honolulu. On this point there is much conflicting testimony, and if the decision of the case turned wholly upon this question, the evidence is not so full and clear as to the "Akamai's" want of ability as a tug-boat, that we should feel prepared, upon that ground alone, to declare the rights and privileges of the Company forfeit.

There was an objection raised in the summing up of the case, as to Mr. Bates' authority to institute this proceeding, and though it was then too late to raise such a question, yet, perhaps, we ought to determine the matter for future guidance.

Mr. Bates was appointed special law adviser of the Crown, for the prosecution of this action, by virtue of the joint resolutions of May 4th, 1847, and as such his power and authority in the premises are unquestionable. (Stat. Laws, vol. 2, p. 73, sec. 1.)

In conclusion, we would say that, if we were able to discover a *bona fide* intention, on the part of the Company, to carry out their contract and furnish the Islands with the requisite steam facilities, we should long hesitate to decree their privileges forfeited; but this we

cannot discover, while on the contrary it appears plain to us, upon the most satisfactory evidence, that there is and has been a lack of any such intention. We think that justice, equity, and a due regard for the public good, require that other parties who may be willing to furnish the requisite steam facilities for the Islands, should no longer be prevented from so doing by the exclusive privileges conferred upon Garret W. Ryckman and others. We think the Company have forfeited the privileges of their grant, and we see no good reason why we should not declare the same forfeit, under the powers conferred upon this Court, by the 13th Article of the said grant. We do, accordingly, adjudge and decree all the exclusive rights, privileges, and exemptions, granted by the Hawaiian Government to Garet W. Ryckman, Emery T. Pease, William A. Lighthall, Perry G. Childs, and Richard H. Bowlin, associated under the name and style of the Hawaiian Steam Navigation Company, and their associates and successors, to be forfeited, and we hereby " declare the same forfeit."

Mr. Bates, for the Crown.

Mr. Campbell and Mr. Montgomery, for defendants.